**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel. ERIC BLACKMON, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> MARCUS HARDY, ) <br> ) <br> Respondent. ) | No. 11 C 2358 <br><br> Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

In 2004, Eric Blackmon was convicted in state court of first degree murder and sentenced to sixty years in prison. He has filed a petition pursuant to 28 U.S.C. § 2254 to vacate his conviction and sentence. For the reasons set forth below, the Court denies the petition.

## Facts

On July 4, 2002 at 4:30 p.m., a Chicago police officer found Tony Cox on the sidewalk near the intersection of Roosevelt and Pulaski, dying from four bullets wounds to the head. (Gov't Ex. A, *People v. Blackmon*, No. 1-05-1377, at 1 (Ill. App. Ct. Sept. 28, 2007).) Frencshun Reece, Lisa McDowell, and Richard Arrigo witnessed the shooting. (*Id.* at 1-2.)

Reece said that she was stopped at the light at Roosevelt and Pulaski and saw four men, three black and one white, talking in front of a restaurant. (Gov't Ex. CC, Tr. at FF-72-73.) She then saw one of the black men shoot Cox (who was also black) and run off with the other black man. (*Id.* at FF-74-75.) After the men took a few steps, however, the second man went back to Cox and shot

him. (*Id.* at FF-75-76.) The white man, Reece said, just stood by and watched the incident. (*Id.* at FF-76-78.)

Later that day, Reece was shown an array that did not contain Blackmon's picture and chose three photos that she said resembled the shooters. (Gov't Ex. A, *People v. Blackmon*, No. 1-05-1377, at 2 (Ill. App. Ct. Sept. 28, 2007).) Two months later, the police showed Reece a second array that contained Blackmon's picture, and she identified him as the second shooter. (*Id.*)

McDowell said she was stopped at the light at the intersection of Roosevelt and Pulaski and saw two black men shoot Cox. (Govt' Ex. CC, Tr. at FF-4-9.) She said the second shooter was about six feet tall, wore braids and was holding a dark-colored gun. (*Id.* at FF-9.) At the end of August, the police showed McDowell a photo array that contained Blackmon's picture, and she identified him as the shooter with dark gun. (*Id*. at FF-12-18.)

On September 5, 2002, both Reece and McDowell identified Blackmon as the second shooter from a lineup. (*Id.* at FF-19-23, 84-86.)

When the police first spoke to Arrigo, who is white, he said that at 4:30 p.m. on July 4, 2002 he was starting to close his restaurant at 1143 S. Pulaski, when he saw Cox out front. (Gov't Ex. X, Common Law Record, Supplemental Answer to Discovery, Ex. G, 9/8/02 General Progress Report at C66.) Arrigo turned his back to lock the restaurant doors and heard two gun shots. (*Id.*) He turned around, saw a black man shoot Cox twice and then run away with another black man. (*Id.*) Arrigo said he did not recognize the shooters, did not hang around with Cox and had not called Cox that day. (*Id.*) Arrigo viewed a line up that included Blackmon but did not identify him or anyone else as a shooter. (*Id.*)

2

The police discovered, however, that Arrigo had called Cox before the shooting, and right after it, called a notorious gang leader named Boonie Black (a/k/a George Davis). (Gov't Ex. X, Common Law Record, Investigation Time Line at C67-68; Gov't Ex. Y, Pet. Post-Conviction Relief, App. 7, 11/13/02 Progress Supplemental Narrative at 1.) When the police confronted Arrigo with this information, Arrigo said he had forgotten he had called Cox and had not set Cox up to be killed. (Gov't Ex. Y, Pet. Post-Conviction Relief, App. 7, 11/13/02 Progress Supplemental Narrative at 1.) Moreover, Arrigo said he had heard that Keno (a/k/a Michael Davis), who was Boonie's nephew, had been involved in the murder. (*Id.*) Arrigo also said he had been in prison at the same time as Boonie and that he and Boonie remained good friends. (*Id.*; *id.*, App. 1, Mem. Tony Cox Homicide.)

At trial, Reece admitted that none of the photos she chose from the array on the day of the murder resembled Blackmon. (Gov't Ex. A, *People v. Blackmon*, No. 1-05-1377, at 3 (Ill. App. Ct. Sept. 28, 2007.) She also she said she immediately identified Blackmon from the second array "because she noticed the same bone protrusion through the shirt," and later because "he looked like Michael Jackson." (*Id.*) (quotation omitted). However, she admitted that she had not mentioned the bone protrusion or Michael Jackson to the police when she first described the shooters to them. (*Id.* at 3-4.)

Selena Leavy, Blackmon's cousin, testified that she was with him on July 4, 2002 at a cookout not far from the murder scene, and that he did not leave the cookout at any time between 3:00 p.m. and 8:00 p.m. (Gov't Ex. EE, Tr. at HH-15-23, 26.) She admitted, however, that when she heard that Blackmon had been arrested for murder, she did not contact the police to tell them

3

about the cookout and refused to speak to a police investigator when he called her. (*Id.* at HH-27-28.)

Tomeka Wash, a friend of Blackmon's, also testified that he was at the cookout, and did not leave it at any time between 2:00 p.m. and 9:00 p.m. (Gov't Ex. DD, Tr. at A-60-65.)

Terrance Boyd testified that on the afternoon of July 4, 2002, he met Cox, who was with Eric Bridges and Boonie, near the corner of Roosevelt and Pulaski. (*Id.* at A-3-6, A-21-22.) Cox told Boyd he needed to talk business with Bridges, so Boyd walked to a nearby alley. (*Id.* at A-7-8.) Shortly after, Boyd heard gunshots, looked around the corner and saw Bridges shoot Cox. (*Id.* at A-8-10.) Boyd did not see Arrigo or another shooter at the scene, and he did not tell anyone what he saw until July 16, 2004, when he was seeking leniency for a federal crime. (*Id.* at A-17-18, 32-35.) The medical examiner testified that Tony Cox had four bullet wounds to his head, two on the right side and two on the left, each of which alone would have been fatal. (Gov't Ex. BB, Tr. at GG-8-22.) He also said that he recovered two bullets from Cox's head, "a small sized copper jacketed bullet" and a "lead bullet . . . without a jacket." (*Id.* at GG-17-27.) A forensic scientist with the Illinois State Police testified that the two bullets recovered from Cox's body had been fired from different guns. (*Id.* at GG-31-43.)

After a bench trial, Blackmon was found guilty of first degree murder and sentenced to sixty years in prison. (Gov't Ex. A, *People v. Blackmon*, No. 1-05-1377, at 1, 5 (Ill. App. Ct. Sept. 28, 2007).)

4

**Discussion**

Blackmon contends that his trial counsel was constitutionally ineffective because he did not call Richard Arrigo or additional alibi witnesses to testify at trial. Blackmon is entitled to § 2254 relief on these claims only if the state court "adjudication of [them] . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

To prevail on an ineffective assistance claim, a prisoner must prove both that his counsel's performance "fell below an objective standard of reasonableness" and that "the deficient performance prejudiced [his] defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Further, the *Strickland* Court said:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (citations and quotation omitted).

The state court did not cite *Strickland*, but it applied the *Strickland* principles to Blackmon's case:

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant. Hodges, 234 Ill. 2d at 17.
>
> . . .
>
> Counsel's decisions regarding the evidence presented and witnesses called at trial are matters of trial strategy, and as such are generally cloaked with immunity from claims of ineffective assistance. Jones, No. 1-07-1190, slip op. at 43. Counsel's strategic decisions will not be second-guessed so that "'the fact that another attorney might have pursued a different strategy is not a factor in the competency determination.'" Jones, No. 1-07-1190, slip op. at 43, quoting, People v. Palmer, 162 Ill. 2d 465, 476 (1994).

(Gov't Ex. H, *People v. Blackmon*, No. 1-08-2028, at 6-7 (Ill. App. Ct. July 28, 2010).) Because it correctly identified the controlling legal standard, the state court's decision was not "contrary to . . . clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

The record also shows that the state court reasonably applied that law to Blackmon's case. The court concluded that Blackmon had not overcome the presumption of reasonableness that applies to counsel's decisions because: (1) testimony from additional alibi witnesses would have been cumulative of Leavy and Wash's testimony; (2) counsel called eyewitness Boyd, whose testimony contradicted that of eyewitnesses McDowell and Reece; and (3) Blackmon had not provided an affidavit from Arrigo attesting that his testimony would have been favorable to Blackmon. (Gov't Ex. H, *People v. Blackmon*, No. 1-08-2028, at 5-8 (Ill. App. Ct. July 28, 2010).) Because this is an entirely reasonable application of *Strickland* to the facts of Blackmon's case, it does not provide a basis for § 2254 relief.

Finally, Blackmon argues that the state court erroneously determined that he had not satisfied the "actual innocence" standard for obtaining merits consideration of procedurally defaulted claims. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("[Our] body of our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway

through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."). The standard is met if Blackmon offers "new reliable evidence" that was not presented at trial, and if it had been, a reasonable juror would more likely than not have had reasonable doubt about his guilt. *House v. Bell*, 547 U.S. 518, 537-38 (2006). Blackmon contends that the affidavits of Latonya Thomas and Lajuan Webb, attesting that they saw the shooting from a nearby hair salon and Blackmon was not one of the shooters, demonstrated actual innocence.

The state court, however, questioned both the reliability of the new evidence and its likely impact on the outcome of the case:

> We further find that the affidavits of Thomas and Webb are not of such conclusive character as to probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32. Here, defendant was found guilty of first degree murder based on the testimony of two eyewitnesses who identified him as one of Cox's shooters. Both were driving near the intersection of Roosevelt and Pulaski at the time of the shooting, and one nearly hit the shooters as they ran across the street in front of her car. Although defendant presented alibi testimony from two defense witnesses who stated that they had seen defendant at a cookout at the time of the shooting, and testimony of an eyewitness who stated that Eric Bridges shot Cox, the court necessarily rejected this evidence in finding defendant guilty. Now, defendant offers the proposed testimony of two eyewitnesses who waited nearly eight years to tell anyone their observations of the shooting. Thomas, who viewed the shooting out the front window of the salon next door while crouched behind a chair, averred that defendant was not one of Cox's shooters, and that a man nicknamed "Pee" was the second shooter. Webb, who viewed the shooting from the salon while ostensibly ducked down or lying on the floor, did not even see the shooting, but averred that two black males with guns ran past the barbershop, neither of whom was defendant.
>
> Given that Thomas did not come forward for nearly eight years after the shooting, viewed the incident while crouched behind a chair inside the business next door, and merely contradicts two other eyewitnesses for the State who were out on the street at the time and have already been found credible enough to convict defendant, we find that Thomas' proposed testimony would not likely change the result on retrial. We also find that Webb's affidavit does not offer defendant the "total vindication" or "exoneration" which are the hallmarks of actual innocence where he did not even see the shooting. *Anderson*, 401 Ill. App. 3d at 141. We therefore cannot say that the affidavits of Thomas and Webb raise the probability that it is more likely than not that no reasonable juror would have convicted defendant in light of the new

7

evidence, and conclude that defendant has failed to set forth a colorable claim of actual innocence. *Edwards*, 2012 IL 111711, ¶ 24.

(Gov't Ex. P, People v. Blackmon, No. 1-11-1908 at 6 (Ill. App. Ct. May 24, 2013).) Given that the state court identified the correct legal standard and applied it reasonably to the facts of this case, the Court has no basis for overturning its "actual innocence" determination.

## Conclusion

For the reasons set forth above, the Court denies Blackmon's 28 U.S.C. § 2254 petition [1]. Moreover, because he has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. This case is terminated.

**SO ORDERED.**                                    **ENTERED: July 16, 2014**

                                                                                    _____
                                                                                    **HON. RONALD A. GUZMAN**
                                                                                    **United States District Judge**