# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERIC BLACKMON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 11 C 2358 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| RANDY PFISTER, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, the Court grants Eric Blackmon's petition for relief under 28 U.S.C. § 2254.

## BACKGROUND

Eric Blackmon seeks a writ of habeas corpus with respect to his September 2004 conviction in the Circuit Court of Cook County for first-degree murder and his sentence of sixty years' imprisonment. The case is before this Court on remand from the Court of Appeals, which vacated the Court's denial of Blackmon's petition and directed the Court to assess whether Blackmon is "actually in custody in violation of the United States Constitution." *Blackmon v. Williams*, 823 F.3d 1088, 1107 (7th Cir. 2016). Blackmon's remaining post-conviction claim is that his trial counsel was constitutionally ineffective because he failed to investigate and present several additional alibi witnesses to testify that Blackmon was at a barbecue at the time the victim, Tony Cox, was fatally shot on July 4, 2002. The Court of Appeals concluded that the state court's finding as to trial counsel's performance was unreasonable, and directed this Court to hold an evidentiary hearing to determine "(1) the extent of counsel's actual pretrial investigation and (2) what [the alibi] witnesses would have said if called to testify at trial." *Id.*

Pursuant to the Court of Appeals' ruling, this Court held an evidentiary hearing on May 16 and 17, 2017, at which it heard Blackmon's testimony as well as that of alibi witnesses Judy Brengettcy, Teresa Martin, Antoinette Leavy, Laushun Melton, Orlando Terrel Wash, Tiarra Topps, Nicole Green, Selena Leavy, Tomeka Wash, Monique Carr, and Sheryce Crowder.[1] The Court also heard the testimony of Bruce Cowan, who was Blackmon's state-court trial counsel, and Robert Murbach, an investigator Cowan hired for the case.

## LEGAL STANDARDS

To prevail on an ineffective-assistance claim, a prisoner must show that his counsel's performance "fell below an objective standard of reasonableness" and that counsel's errors prejudiced him in that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Blackmon*, 823 F.3d at 1102-03 (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). As for the prejudice prong of the analysis, "Blackmon does not have to prove actual innocence; he does not even have to show that counsel's errors more likely than not altered the outcome in his case. He must show only a

---

[1] Carr and Crowder's testimony was introduced through videotaped deposition and the corresponding transcripts. The other alibi witnesses' testimony was live.

Although the Court of Appeals stated in its opinion that it saw no reason why Blackmon, on remand, would not be able to call two witnesses who were employees of a barber shop adjacent to the scene of Cox's murder and whose affidavits Blackmon submitted with his post-conviction filings and habeas corpus petition, Blackmon did not call those witnesses.

reasonable likelihood that the outcome would have been different—that is, a likelihood that is substantial, not just conceivable." *Id.* at 1107 (citations and internal quotation marks omitted).[2]

"The Constitution does not oblige counsel to present each and every witness that is suggested to him. Instead, it simply obliges counsel to investigate the various lines of defense available in a given case." *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013) (internal quotation marks and citation omitted). If counsel has made a thorough investigation of law and facts and consciously decided not to call certain witnesses, the decision is probably strategic and thus insulated from attack on ineffective-assistance grounds. *Blackmon*, 823 F.3d at 1103-04. "An outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance." *Carter v. Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) (quoting *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005)); *see also Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

---

[2]Respondent contends that Blackmon must also rebut with clear and convincing evidence "the state court's findings that he killed Tony Cox and that his 'alibi' is false." (ECF No. 119, Resp't's Post-Hr'g Br. at 15.) This argument, which ignores the Court of Appeals' opinion, is rejected. The thrust of the Court of Appeals' ruling is that the state court's decision was unreasonable and based on an underdeveloped record. 823 F.3d at 1092, 1105. The insufficiency of the record as to trial counsel's performance regarding the alibi witnesses and the fact that the state court therefore "did not make a critical factual finding to which we may defer," *see Taylor v. Grounds*, 721 F.3d 809, 824 (7th Cir. 2013), is precisely why the Court of Appeals remanded the case to this Court for an evidentiary hearing.

**ANALYSIS**

**A.    Trial Counsel's Investigation**

*Eric Blackmon*

Blackmon testified in pertinent part as follows.    When Blackmon was arrested in September 2002, he was taken to the Chicago police station at Harrison Street and Kedzie Avenue, where he was told that he was being arrested for Cox's July 4 shooting death.    At the police station, Blackmon eventually met with Cowan for about twenty minutes, and told Cowan that he did not shoot Cox and that he was at a barbecue on Homan Avenue on the day of the shooting.    Blackmon "didn't go into names specifically" at that time, but he told Cowan that "there were a lot of people present" at the barbecue.    (ECF No. 117-1, 5/16/2017 PM Hr'g Tr. at 41.)    After this conversation and during the pretrial period, Blackmon and Cowan discussed the alibi defense.    Cowan told Blackmon that in order for him to be able to call alibi witnesses at trial, he would need "the name, address, telephone number, date of birth of the witnesses," and if Blackmon "could not come up with that, just come up with some identifying [sic] or a way that they could be found, something like that."    (*Id.* at 43.)

Following his arrest, Blackmon was detained at the Cook County Jail until February 2004, when he was transferred to Stateville Correctional Center.    Blackmon said that while he was there, he used Stateville's law library to create two typewritten lists of people who he believed could vouch for his presence at the barbecue.    The first, titled "Witness List," contains the names of Sheryce Crowder, Sean Dallas, "Antionette" [sic] Leavy, Selena Leavy, and Tomeka Wash, as well as their birthdates, addresses, and telephone numbers.    (Pet'r's Hr'g Ex. 2.)    Blackmon said that this was a list of the people for whom he was able to provide all of the information Cowan requested.    The second, titled "Potential Witness List," lists Teresa Martin,

4

"Lashun," "Judy," "Monique Washington," "Nichole" [sic] Green, Phillip Robinson, Kyeuna Vance,[3] and unnamed "Residents" of four addresses on South Homan Avenue (one of which, he noted on the list, was Tomeka Wash's residence). (Pet'r's Hr'g Ex. 3.) For those on the second list, Blackmon listed only partial information; he listed most of their addresses, one person's phone number, and for "Lashun" and "Judy," he stated on the list that they were friends of Teresa Martin and that Martin could provide more information. Blackmon testified that he gave two copies of each list to Cowan when he met with him "in the back, in the jury room of the court" in conjunction with one of Blackmon's pretrial hearings, in February, March, or April 2004. (5/16/2017 PM Hr'g Tr. at 50-51.) According to Blackmon, Cowan responded by saying, "Oh, great, I'm gonna get in touch with all of them, I'll get in touch with all of them and have them here." (*Id.* at 59.)

At subsequent pretrial hearings, Cowan told Blackmon that he "had got the witnesses," they would be at trial, and "everything was going great." (*Id.* at 60.) Cowan never told him that the information he had provided was inadequate, that any of them were unnecessary or would not make good witnesses, or that he had decided not to call those alibi witnesses. After the trial began, however, Blackmon began to doubt that Cowan would present the alibi witnesses, after "some of the other things" Cowan had said would occur at trial did not. (*Id.* at 61.) While Blackmon was seated at the defense table with Cowan, Blackmon asked him where the alibi witnesses were, and Cowan "blew [him] off." (*Id.* at 62.) So Blackmon tried to phone witnesses

---

[3]Blackmon testified that Ms. Vance is now deceased.

himself and also asked his mother to phone them. Two alibi witnesses—Selena Leavy and Tomeka Wash—testified at trial.[4]

### *Bruce Cowan*

Attorney Cowan testified that he first met with Blackmon at the jail in a meeting that lasted for "hours." (ECF No. 118, 5/17/2017 AM Hr'g Tr. at 52.) Although Cowan took notes of the meeting, he does not know where those notes are today, and he does not know where his file for Blackmon's case is, even though it eventually "blossomed into three or four folders." (*Id.* at 53, 58.) Because Cowan purges his files "every nine, ten years," he believes that it is most likely that the file was destroyed in the normal course of business. (*Id.* at 53-54.)

Cowan corroborated Blackmon's testimony that he proclaimed his innocence from the outset and told Cowan that he had been at a barbecue on the day of, and at the time of, Cox's murder. Blackmon told Cowan at their first meeting that "there were a lot of people" at the barbecue; "it was an open barbecue, and a lot of people that attended . . . were not people he knew but they were welcome"; and "the lady that threw the barbecue" was "Ms. Wash." (*Id.* at 57.) During that meeting, Blackmon provided Cowan with Tomeka Wash and Selena Leavy's names. Cowan said that he told Blackmon that he "certainly would follow up as to the barbecue." (*Id.* at 58.)

Cowan met with Blackmon on several occasions during the two years between this first meeting and the trial. During that time, the only names Blackmon mentioned to Cowan were those of Tomeka Wash and Selena Leavy, and possibly Antoinette Leavy. Cowan said that he "went out to see" Tomeka Wash. (*Id.* at 74-75.) When asked to describe Wash's physical

---

[4]The state court found that their testimony about the barbecue lacked credibility.

appearance, Cowan demurred, cited the length of time that had passed since the trial, and said, "I know she was a black lady, kind of short--no, I can't [recall]." (*Id.* at 80-81.) When asked how old she was, and whether he would describe her as an older lady or middle-aged (she was 22 when she testified at trial), Cowan replied: "I really--I can't remember what she looked like. I know that I met her, I spoke with her a number of times. I can't remember what she looked like. I was more interested in what she told me, how she was helping our case." (*Id.* at 81.) Blackmon "might have" also given Sean Dallas's name to Cowan; Cowan was not sure how he had learned about him. (*Id.* at 61.) Cowan also stated that he "may have spoken with" Dallas: "I was waiting for him. We didn't subpoena him, but he was supposed to come to the trial to testify because he might have been helpful." (*Id.* at 62-63.)

Cowan denied Blackmon's claim that he had given Cowan two lists of possible alibi witnesses. (*Id.* at 62, 71, 73.) Cowan stated that he had hired Murbach as an investigator and paid Murbach "out of [his] own pocket $2,500 from the fee paid to [him]," and that if Cowan had been given anything like a witness list, first he "would have tried to follow up on it" and then he would have given it to Murbach "to investigate or catch up with these people and find out if they could help us." (*Id.* at 62.) Regarding his work with respect to alibi witnesses, Cowan further testified:

> A. Antoinette Leavy, I believe I spoke with her and her daughter, Selena Leavy.[5] . . . I can't remember if I got the name Selena Leavy or Antoinette Leavy from Mr. Blackmon or not. But I did--I recognized the name Selena Leavy, and she did testify at the trial.
>
> I didn't call Antoinette Leavy because I spoke with her and I didn't call her, so--she was not gonna be helpful, so she did not testify.
>
> And I know that he gave me the name of Ms. Wash because she threw the barbecue. But he never gave me a written list ever.

---

[5]Antoinette and Selena Leavy are sisters.

. . .

Q. You indicated that you talked to Antoinette Leavy. Do I correctly understand your answer?

. . .

A. I believe I spoke with her– . . .

Q. What did she tell you in terms of the case and, in particular, with respect to the issue of the barbecue?

A. I can't recall exactly. All I can tell you is, if she didn't tell me that she saw-- or she could testify that she saw Mr. Blackmon at the barbecue the whole time, she couldn't swear to it, I wouldn't have called her as a witness.

Q. And that's because why? If she couldn't take the whole time, why did you reason that you wouldn't call her as a witness?

A. If she couldn't swear that he was there and that she had seen him and watched him, or she could testify that she saw him at the crucial time, then--if all she could say is that she saw him at the barbecue at one time or another, she couldn't recall the time, I wouldn't have called her.

Q. It was crucial that that barbecue attendee be able to vouch for Eric's presence at 4:30 at the barbecue, in your opinion, is that correct?

A. Yes.

Q. And you continued your search, did you not, to find such a person who could vouch for his presence at that barbecue at that time?

A. Yes.

Q. What did you do in order to locate such a person?

A. I went out to the scene of the barbecue and I looked at the empty lot, or where it was, to surmise in my own mind if there was a crowd of people there who could see who. And I spoke to Mrs.--Ms. Wash at that time, when I went out to the empty lot, and I canvassed the neighborhood. I knocked on doors, introduced myself, asked people if they were at the barbecue, did they know Mr. Blackmon.

Q. Did you make a list?

A. I didn't have anyone that told me that they saw--that they were at the barbecue, or if they were, that they saw Mr. Blackmon.

Q. So in terms of the investigation that you did, you came up with no new names, am I correct?

A. Came up empty.

Q. Empty.

A. And that was--I believe Mr. Murbach and I discussed that on the several occasions that we met, and if he felt it--to follow up on what I did, necessary to do that, to try to find it, I told him to do it.

Q. These are your recollections of conversations you had with your investigator, Mr. Murbach; is that what you're stating?

A. Yeah. We talked several times. I told him what I had done, and I gave him a full copy of the file, made copies of every document. And I specifically told him to canvas areas where he might find somebody that could help us.

Q. And you told him to find that person who saw Eric at 4:30 at that barbecue on that day, did you not?

A.  No.  I explained the circumstances.  We talked many times.  I told him there were two situations or circumstances.  I had gone out and canvassed the area of the incident of the murder . . . . I got nowhere doing that.  I told him about that.

I told him that--that was one of the assignments I gave him, go back, go into these businesses, residential, talk to people on the street, see if you can find someone that will help us.

Q.  All right.  Now, did you tell him what it meant, that would help us?  Did you define that for him?

A.  Yeah.  Anyone else at the barbecue and anyone that was--that saw the murder.

Q.  And how about anybody who was at the barbecue who saw Eric at 4:30 on the afternoon of that murder?

A.  That was--yeah, that they--an alibi.  I had told him I had spoke to Eric, and if he felt that he should go out and talk to Eric, do that, visit him at the jail.  But I told--he had a copy of the file.  He knew when the murder took place.  I told him how far away the barbecue was, and if we could place Mr. Blackmon at the barbecue, that would be another parameter of our defense.

Q.  And that was part of his assignment that you gave to him, correct?

A.  Discussed that with him, yes.

Q.  And that's your recollection today, correct?

A.  My recollection today, sir, is that I gave him a copy of the file.  I told him the two parameters of our defense. . . . And I told him another part of our defense would be the alibi and he could--if he could follow up with that or he felt it was necessary.  I told him I had been out there.  I told him--I knocked on doors, I talked to Ms. Wash at her home and I came up empty.  If he felt it was necessary to go out there and retrace my steps, he should do that.

(*Id.* at 63-67.)  Cowan said that at subsequent meetings with Blackmon prior to trial, he told

Blackmon that he had been unable to find additional alibi witnesses.  When asked whether

Blackmon had suggested any additional names at these meetings, Cowan replied:

A.  No. You've asked me that.

If he--let me explain.  At one point I hired an investigator.  I told you I paid him $2,500, because I asked the family for that money.  They didn't have it, so I paid it out of the fee that they gave me.

I gave him $2,500.  We met.  I gave him copies of the file.  If Mr. Blackmon had given me orally or in writing any other names, I would have given those names to Mr. Murbach.  First I would have tried myself or I would have gone out with Mr. Murbach in tandem.  I had given him those names and told him to follow up on them.  After all, I was paying him.  That's what his job would have been.  So, no, I didn't get any extra names.

(*Id.* at 70-71.)  Cowan said that even though Blackmon exhibited frustration when Cowan told him that he could not find any witnesses, Blackmon did not at that point provide any additional names of people to investigate. According to Cowan, prior to his deposition in this case, he had never heard of Sheryce Crowder, Teresa Martin, "Lashun," "Judy," "Monique Washington" or Monique Carr, Nicole Green, Phillip Robinson, or Kyeuna Vance.  (*Id.* at 62, 72-73, 76.)

### *Robert Murbach*

Cowan's investigator, Robert Murbach, testified that he was not acquainted with Cowan prior to being hired to work on Blackmon's case.  Cowan provided Murbach with some documents, which Murbach reviewed and then "went out and interviewed people."  (*Id.* at 37.) Murbach recalled that Cowan had "provided some people to go interview" and that Murbach had developed "other names" by reading the file.  (*Id.* at 37-38.)  Murbach interviewed a man named Mr. Arrigo, who was the owner of the restaurant in front of which Tony Cox's shooting occurred, and a man named Mr. Castaldo, who was "somehow connected with" Arrigo.  (*Id.* at 38.)  Murbach stated that Cowan did not advise him that Blackmon had an alibi defense, and that Murbach was unaware of an alibi defense when he worked on the case.

Murbach did not recall interviewing any alibi witnesses, and although Cowan had given him "a list of people," he did not know if they were alibi witnesses.  (*Id.* at 39.)  It was brought out that Murbach had testified at his deposition that he had not interviewed any alibi witnesses. (*Id.* at 42.)  He stated that he did not recall whether he had interviewed Tomeka Wash, and later stated that he did not interview any people who were at the barbecue.  Murbach did not remember having a conversation with Cowan about ensuring any witnesses' appearance for trial. In an invoice dated April 22, 2004, the only invoice he sent to Cowan, Murbach billed Cowan for 25 hours of work on Blackmon's case.

*Alibi Witnesses*

Judy Brengettcy, Teresa Martin, Antoinette Leavy, Laushun Melton, Orlando Terrel Wash, Tiarra Topps, Nicole Green, Selena Leavy, Tomeka Wash, Monique Carr, and Sheryce Crowder all testified that they were at the July 4, 2002 barbecue and saw Blackmon there that afternoon. All but Selena Leavy, Tomeka Wash, and Sheryce Crowder testified that they were not contacted by a lawyer or an investigator for Blackmon prior to Blackmon's trial.

Selena Leavy stated that shortly after Blackmon's arrest, she (along with her grandmother and Blackmon's mother) spoke with Cowan at her grandmother's house. Selena told Cowan, who was aware that she was related to Blackmon, that it was "impossible" for Blackmon to have committed the murder because he was with her and her sister that day. (*Id.* at 21-22.) Cowan asked her if she would be willing to testify at trial; she said yes, and Cowan said that he would contact her. He also recommended that she not talk to anyone about the case. She was never contacted by an investigator who was working for Blackmon. The next time Selena saw Cowan was at trial. It was Blackmon's mother, not Cowan, who contacted her to ask her to come to court. Prior to testifying, Selena spoke "very briefly" to Cowan, who did not tell her what questions he might ask or inquire any further about others at the barbecue. (*Id.* at 25.)

Tomeka Wash recalled meeting Cowan only once, in the courtroom on the day she testified at Blackmon's trial. Before taking the stand, she and Cowan discussed the barbecue for about ten minutes; he did not ask her for the names of others who had been there.

Sheryce Crowder, who was Blackmon's girlfriend at the time of his arrest and trial and has a daughter with him, testified that she attended the trial and all of Blackmon's pretrial hearings and talked with Cowan several times, mostly about Cowan's fee. Although she told

Cowan multiple times that she had been at the barbecue with Blackmon, Cowan did not ask her to testify. She does not recall whether an investigator contacted her.

### *The Court's Findings*

Blackmon provided straightforward answers to questions at the evidentiary hearing and was generally credible. In contrast, Cowan was defensive and evasive. Several times, he provided a narrative when there was no question pending or provided a narrative answer that was not responsive to the question pending. (5/17/2017 AM Hr'g Tr. at 54-56; 62; 63; 65; 76-78.) Cowan repeatedly steered away from questions about the alibi defense and alibi witnesses by discussing his actions with respect to investigating the murder scene and the eyewitnesses to the murder. Furthermore, his answers were often noncommittal and hedging. For example, when he was asked whether he had told Blackmon at their various pretrial meetings about any progress (or lack thereof) on the alibi defense, Cowan was evasive and had to be asked several times what he had told Blackmon. He eventually replied: "I may have said to him that so far I haven't turned up any other names than the ones so far, Ms. Leavy and Ms. Wash, that saw you at the barbecue. I told him we--I would tell him that we haven't found anyone further. I would be very specific about that." (*Id.* at 68.) Cowan also stated that he "would go in the back [of the courtroom] and speak to [Blackmon] or at the table and tell him nothing--we haven't found any other alibi witnesses." (*Id.* at 70.)

Cowan's account of the steps he took to investigate Blackmon's alibi simply was not believable. Cowan said that he "went out to the scene of the barbecue," looked at the empty lot "to surmise in [his] own mind if there was a crowd of people there who could see who," and then "canvassed the neighborhood" and knocked on doors in an attempt to could find someone who had been at the barbecue. (5/17/2017 AM Hr'g Tr. at 65.) He later added that as part of this

effort, he had "stopped people on the street," which strikes the Court as farfetched. (*Id.* at 74.) Such efforts would have made little sense when the alibi defense did not involve eyewitness positions or sight lines for a discrete event like the shooting, but initially ascertaining who had attended a barbecue with Blackmon on the afternoon in question. Similarly, "canvassing" the neighborhood, knocking on doors, and stopping people on the street would have been an extremely inefficient way to ascertain the identities of barbecue attendees on a case in which, Cowan volunteered, money was tight, as well as a strategy that was highly unlikely to yield any witnesses.

The obvious and efficient starting point (as well as one that would have been much more likely to have been effective) would have been to obtain information from Blackmon about the people at the barbecue, which Blackmon credibly said he provided to Cowan by way of the two lists. Cowan's denial of having received the lists prior to trial was not credible, for several reasons. Cowan was curiously unable to say what happened to his case file, yet he insisted that Blackmon had never given him a witness list.[6] His testimony as to whom Blackmon had mentioned, however, was not entirely consistent. Cowan first stated that Tomeka Wash and Selena Leavy were "the only two" names Blackmon gave him. (*Id.* at 61.) Cowan quickly added that Blackmon "might have given" him Sean Dallas's name, and soon thereafter volunteered that although he did not subpoena Dallas, he "may have spoken with him" and that Dallas was "supposed to come to the trial because he might have been helpful." (*Id.* at 61, 63.)

---

[6]Cowan went so far as to say that even if he still had the file, he would not have needed to review it in order to determine whether he had heard of any of the alibi witnesses' names or interviewed those witnesses. (*Id.* at 77-78.)

Cowan then mentioned Antoinette Leavy and said that he could not remember whether Blackmon had provided her name.

Furthermore, as Blackmon points out (and respondent fails to address), the state-court record supports his testimony that he gave Cowan the names of several alibi witnesses, and it strongly suggests that he was telling the truth when he said that he gave Cowan the witness lists in early 2004.[7] At a pretrial hearing on July 26, 2004, the court asked whether the defense was filing its answer to discovery that day. Cowan replied in the affirmative, and the prosecutor stated that he was "in receipt of an answer to discovery which lists several alibi witnesses." (ECF No. 38-6 at 322, Tr. of 7/26/2004 State-Ct. Hr'g.) The prosecutor requested time to "check those witnesses out." (*Id.*) And, in fact, the State contacted[8] all five alibi witnesses on Blackmon's first witness list, which included Sheryce Crowder, whose name Cowan denied ever

---

[7]Respondent contends that Blackmon's "claim that he waited a year and a half after his arrest to alert Cowan to the identities of his 'alibi' witnesses via the lists is not credible." (Resp't's Post-Hr'g Br. at 3.) The Court agrees with petitioner that the delay is easily (and reasonably) explained. Cowan simultaneously represented petitioner on a drug case, which was resolved prior to the murder case, in February 2004. At that time, the state court set a status hearing on the murder case. Two months later, Murbach billed Cowan for his work, and Cowan filed a motion to suppress identifications in the murder case. It was not until July that alibi witnesses were discussed with the court. A reasonable inference is that work began in earnest on the murder case only after the drug case was resolved; therefore, it makes sense that Blackmon would not have supplied Cowan with written lists of possible alibi witnesses until spring 2004.

[8]Prior to trial, investigators for the state interviewed Sheryce Crowder, Sean Dallas, Antoinette Leavy, and Tomeka Wash. An investigator attempted to interview Selena Leavy, who declined to be interviewed, stating that Cowan had "told her not to talk to anyone about [the] case." (5/17/2017 AM Hr'g Tr. at 241-42.)

hearing prior to this proceeding.[9]  (5/17/2017 AM Hr'g Tr. at 241-42.)  The list also included

Sean Dallas, whose real name is Eddie Garrett, a fact that Blackmon said he learned at some

point after he created the list.  The fact that the State had the name "Sean Dallas" suggests that

Cowan obtained the name from Blackmon and in turn provided it to the prosecution.

After the prosecutor requested additional time to investigate the alibi witnesses, Cowan

added: "And today I augmented that list.  I have not had a chance to--*I believe there are several*

*new names.  I will put that in written form on a supplemental answer* and get it to [the

prosecutor], but it has the names that I have given him this morning."  (ECF No. 38-6 at 322, Tr.

of 7/26/2004 State-Ct. Hr'g (emphasis added).)  The state-court record, however, does not reflect

that a supplemental answer to discovery was ever filed with the court, and there is no indication

that the State interviewed any of the individuals who appear on Blackmon's second list.  The

Court agrees with Blackmon that Cowan's statement about "augment[ing]" his discovery

response with "new names" likely resulted from his having received the second, "potential

witness" list from Blackmon.

Cowan's credibility was further undermined by Murbach, who contradicted Cowan's

claim that he asked Murbach to look for additional alibi witnesses.  Murbach testified that

Cowan did not tell him about Blackmon's alibi defense.  And he did not do any work on the case

after he billed Cowan on April 22, 2004, which was months before Cowan first mentioned alibi

---

[9]The state-court record also contradicts Cowan's testimony that he had never heard of
Sheryce Crowder.  Crowder credibly testified that she was Blackmon's girlfriend at the relevant
time; she was pregnant with his child in 2002 and gave birth to their daughter before trial; she
attended his court hearings and trial; and she spoke several times with Cowan at the hearings, mostly
about his attorney's fee.  Moreover, at trial, Tomeka Wash testified on cross-examination that she
knew the mother of Blackmon's child, whose name was "Shareese."  (ECF No. 38-6 at 830.)

witnesses in court. The most reasonable inference is that Cowan never asked Murbach to investigate the information Blackmon provided in his witness lists.

The Court's conclusion that Cowan conducted a woefully incomplete investigation of Blackmon's alibi defense is bolstered by the short shrift given to that defense at trial. Cowan did not mention the alibi in opening or closing argument, even though the prosecution addressed it in its closing argument; he focused solely on the scene of the murder and witness identifications. The defense Cowan put on consisted primarily of extended cross-examination of the prosecution's two eyewitnesses to Cox's murder and the presentation of the competing testimony of another eyewitness. The alibi witnesses were offered in what seemed like an afterthought, at the close of the defense case. Additionally, as the Court of Appeals discussed, the prosecution brought out on cross-examination that Wash had two felony convictions and that Selena Leavy is Blackmon's cousin. In its ruling following the bench trial, the state court rejected Blackmon's alibi, noting that Wash's credibility was undermined by her convictions and deeming it "interesting" that Leavy's family ties to Blackmon were revealed only on cross-examination. These topics were likely overlooked on direct examination because Cowan had done very little to familiarize himself with Wash and Selena Leavy or to prepare them to testify.

Respondent makes much of *Strickland*'s presumption that strategic judgments made by defense counsel are reasonable. But, as the Court of Appeals has observed, the presumption "applies only if the lawyer actually exercised judgment." *Jones v. Calloway*, 842 F.3d 454, 464 (7th Cir. 2016); *see also Blackmon*, 823 F.3d at 1104 ("If counsel never learned what the witnesses would have said, he could not possibly have made a reasonable professional judgment that their testimony would have been cumulative.") (citation and internal quotation marks omitted). There is no evidence that Cowan made any actual strategic judgments about calling

any of the alibi witnesses; therefore, the presumption does not apply here. The only explanation Cowan provided for deciding not to call a particular witness pertained to Antoinette Leavy: "I spoke with her and I didn't call her, so--she was not gonna be helpful, so she did not testify." (5/17/2017 AM Hr'g Tr. at 63.) That is a non-explanation, and it is telling that it was not expressed as a decision, but merely a statement that Leavy "did not testify." Immediately thereafter, Cowan equivocated, stating that he "believe[d]" he had spoken with her. (*Id.* at 63-64.) But he was unable to "recall exactly" what Antoinette Leavy had told him, and he speculated that she could not vouch for Blackmon's presence at the barbecue at exactly 4:30 p.m. (*Id.* at 64.) Cowan's hypothetical rationale cannot be characterized as a strategic trial choice.[10]

For the reasons discussed above, the Court finds as follows with respect to Cowan's performance. Cowan's testimony that he canvassed the neighborhood of the barbecue, knocked on doors, and stopped people on the street in an effort to find alibi witnesses is not credible. Cowan's testimony that he assigned Murbach to attempt to find alibi witnesses who were at the barbecue is not credible. Blackmon's testimony that he created two witness lists and gave them to Cowan prior to trial with adequate time to investigate the individuals listed therein is credible, and Cowan's denial of having received the lists is not credible. The lists contained detailed identifying information for many of the alibi witnesses, and Cowan could have asked those

---

[10]Even if the hypothetical were true, it would not have made much sense to treat Antoinette Leavy as a wholly unhelpful witness simply because she could not definitively place Blackmon at the barbecue at exactly 4:30 p.m. As the Court of Appeals noted: "At a casual gathering with people coming and going, it is perhaps unlikely that a single person could vouch for Blackmon's continued presence there. But adding another witness who can say the same thing makes it less likely that Blackmon would have been able to slip away unseen long enough to commit the murder. Adding six such witnesses makes it less likely still . . . ." 823 F.3d at 1106.

witnesses for more information about the remaining witnesses. With reasonable investigation of the lists, Cowan could have found and interviewed all or most of the nine uncalled alibi witnesses.[11] Cowan failed to interview the uncalled alibi witnesses who appeared on Blackmon's lists and failed to conduct his own investigation of possible alibi witnesses or to have Murbach perform such an investigation. Nothing in the record reasonably justifies those decisions. Therefore, Cowan's performance was deficient under *Strickland*. *See Campbell v. Reardon*, 780 F.3d 752, 768-69 (7th Cir. 2015).

**B.     The Alibi Witnesses and Prejudice**

Under the second *Strickland* prong, the Court examines prejudice. The Court of Appeals instructed this Court to develop the record regarding what Blackmon's alibi witnesses would have said if called to testify at trial. The Court now determines whether, considering the totality of the evidence before the state court and the evidence developed at the hearing on remand, there is a reasonable probability that the state court would have acquitted Blackmon had the additional evidence been presented. The Court concludes that Blackmon has established such a likelihood.

At the evidentiary hearing, eleven witnesses (the seven uncalled alibi witnesses identified by Blackmon in his post-conviction materials and discussed by the Court of Appeals; additional

---

[11]Of the nine uncalled alibi witnesses who testified at the evidentiary hearing, the full names and all or some of the identifying information for four of them, including Teresa Martin, appeared on Blackmon's lists. The first names of Judy Brengettcy and Laushun Melton appeared on the second list, and Blackmon noted on that list that they were friends of Teresa Martin. Orlando Terrel Wash did not appear on either list, but he is the cousin of, and could have been found through, Tomeka Wash, who testified at trial but said that she only spoke to Cowan immediately before testifying. Monique Carr's name did not appear on either list, but Carr could have been found through Sheryce Crowder, who testified that she saw Carr at the barbecue. Tiarra Topps did not appear on either list, but she is Carr's best friend, and Crowder testified that she had seen Topps at the barbecue as well. Furthermore, many of the witnesses knew or were acquainted with each other and testified that they saw various other witnesses at the barbecue.

alibi witnesses Orlando Terrel Wash and Nicole Green; and Selena Leavy and Tomeka Wash, who had testified at trial) all testified that they had attended the barbecue on Homan Avenue, where they saw Blackmon, and that no one saw Blackmon leave the barbecue or return from somewhere else. All of these witnesses except Antoinette Leavy and Nicole Green could recall being at the barbecue at 4:30 p.m., and Leavy said that she arrived between 4:00 and 5:00 p.m. Some of the alibi witnesses' testimony concerning the details of that day (largely, Sheryce Crowder's) was not entirely consistent with others'. However, the variations were not significant, and the witnesses' testimony regarding other details was consistent. The only other issue with the uncalled alibi witnesses' testimony was that most of them were unable to recall the circumstances under which they had signed the affidavits that Blackmon attached to his post-conviction filings. But that phenomenon is unremarkable, considering that several years had passed since the execution of the affidavits. In any event, each affiant confirmed signing her respective affidavit.[12] Of greater importance is the fact that the alibi witnesses offered generally consistent accounts of the events of July 4, 2002, including Blackmon's presence and conduct at the barbecue, which was consistently described as an informal gathering held on a lot or yard between houses.[13] The witnesses' accounts also were largely consistent with what they had stated in their affidavits. Several witnesses recalled that during the party, Blackmon was grilling

---

[12]As the Court of Appeals noted, "All of the witnesses are vulnerable to attacks on their memory at this point." 823 F.3d at 1107.

[13]According to Blackmon, he, Tomeka Wash, and Sean Dallas "decided to throw the barbecue," and held it on "a vacant lot in the 1300 block of Homan, directly like a little bit across from" Wash's house. "There were houses on both sides of the lot," and at the rear of the lot, a recreational center called the ABC Center, which had playground equipment. (5/16/2017 PM Hr'g Tr. at 44-46.) Tomeka Wash testified at trial that they held the barbecue on a lot across the street from her house at 1315 South Homan, and explained that the "lot" was the yard of a vacant house.

meat and playing cards. Several witnesses remembered specific interactions with Blackmon (such as hugging him upon arriving, playing cards with him, and getting a plate of food from him). The Court agrees with petitioner that the witnesses' "combined testimony paints a picture of Blackmon as one of the hosts and organizers of the barbecue, fully engaged in cooking, greeting, and feeding people; playing cards (specifically, the game of spades); and providing the music." (ECF No. 116, Pet'r's Post-Hr'g Br. at 12.)

In discrediting the trial testimony of Selena Leavy and Tomeka Wash, the state court placed great weight on two factors—Leavy's familial relationship with Blackmon and Wash's felony convictions. Of the additional witnesses, Antoinette Leavy, like Selena Leavy, is Blackmon's cousin, and Teresa Martin testified that she believes, but does not know for sure, that she is also a cousin of Blackmon and the Leavys. The remaining witnesses are not related to Blackmon. Sheryce Crowder (the mother of Blackmon's child) and Monique Carr (the mother of Blackmon's niece) are more closely connected with Blackmon, but the others, like Brengettcy, Melton, Topps, Green, and Orlando Terrel Wash, do not appear to be particularly close to him. As petitioner points out, one would expect that he would be at least acquainted with people at a barbecue that he helped organize, and his relatively distant connection with the majority of the alibi witnesses leads the Court to conclude that they are not unduly biased in favor of Blackmon. Only one of the additional witnesses, Nicole Green, had a felony conviction at the time of trial. Furthermore, having observed the alibi witnesses' demeanor on the stand, the Court found them to be responsive and, on the whole, credible.

In sum, even if one were to discount the testimony of the additional witnesses who are closely connected with Blackmon, that leaves several additional witnesses who credibly testified that they were at the barbecue at the time of Cox's murder; they saw Blackmon at the barbecue

throughout the afternoon on that day; and they never saw him leave or return. Had Cowan reasonably investigated and interviewed these witnesses, he would have found several who did not have familial ties to Blackmon or felony convictions and who would have corroborated Selena Leavy and Tomeka Wash's trial testimony. As the Court of Appeals discussed, the addition of so many credible witnesses who could vouch for Blackmon's presence at the barbecue, many of whom testified about actual interactions with Blackmon during the afternoon, makes it much "less likely that Blackmon would have been able to slip away unseen long enough to commit the murder," even accounting for the fact that the murder took place about a mile away. *See* 823 F.3d at 1106 ("In a large-group setting like this one, the collective weight of the other guests' testimony is greater than the sum of their individual accounts."). Their testimony could have raised a reasonable doubt about Blackmon's involvement in the murder of Tony Cox. Considering the "weak case for Blackmon's guilt," 823 F.3d at 1106-07 (discussing the "complete lack of any motive, the dearth of physical evidence, and the heavy reliance on the eyewitness identifications of two strangers who saw the killers for only seconds"), the Court concludes that Blackmon would have had a reasonable chance of acquittal absent counsel's errors.

Through the evidence presented on remand, Blackmon has satisfied both prongs of *Strickland*. Accordingly, the Court concludes that Blackmon is in custody in violation of the United States Constitution.

## CONCLUSION

The Court grants Eric Blackmon's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. An order shall issue directing respondent to release petitioner within 45 days of

the order unless the State declares its intention, within those 45 days, to retry him.  This case is terminated.

**DATE**:  February 7, 2018

_____
**Ronald A. Guzmán**
**United States District Judge**